693 A.2d 1198

JUDITH SEMLER, MARY LOU YULE, TIMOTHY LENAHAN AND JAMES M. LENAHAN, PLAINTIFFS–RESPONDENTS/CROSS–APPELLANTS, v. CORESTATES BANK, SUCCESSOR BY MERGER TO FIRST PENNSYLVANIA BANK, N.A., INDIVIDUALLY AND AS TRUSTEE APPOINTED UNDER DEED OF TRUST BY HENRY FRANCIS LENAHAN, DECEASED, DEFENDANT AND THIRD–PARTY PLAINTIFF–APPELLANT/CROSS–RESPONDENT, AND HENRY F. LENAHAN, JR., THIRD–PARTY DEFENDANT.

Superior Court of New Jersey
Appellate Division

Argued February 10, 1997—Decided May 22, 1997.

---

Before Judges HAVEY, BROCHIN and EICHEN.

*Glenn P. Callahan* argued the cause for appellant/cross–respondent (*McCarter & English,* attorneys; *Mr. Callahan,* of counsel; *Mr. Callahan* and *Therese M. Keeley,* on the brief).

*Lars S. Hyberg* argued the cause for respondent/cross–appellant (*McAllister, Hyberg & White,* attorneys; *Mr. Hyberg,* on the brief).

The opinion of the court was delivered by

BROCHIN, J.A.D.

Defendant CoreStates Bank, successor by merger to First Pennsylvania Bank, N.A., is a co-executor and co-trustee of the estate of Henry F. Lenahan, Sr. who died in 1977. The other co-executor and co-trustee is the decedent's older son, third-party defendant Henry F. ("Hank") Lenahan, Jr. He and the decedent's other children, plaintiffs Judith Semler, Mary Lou Yule, Timothy Lenahan, and James M. Lenahan are the sole beneficiaries of Henry F. Lenahan, Sr.'s estate. The largest single asset of the estate was a $700,000 installment promissory note from Lenahan Plastics, Inc., a Tennessee corporation, to Mr. Lenahan, Sr. Lenahan Plastics failed to pay $373,333.28 of principal plus accrued interest, and that portion of the debt is now uncollectible from the obligor corporation. Plaintiffs attribute the uncollectibility of the note to CoreStates' failure to perform its fiduciary duties with proper diligence and skill. They contend that, as a result, the bank is liable to compensate them for their loss. After a lengthy bench trial, the Chancery Division, Probate Part, agreed with plaintiffs and entered judgment in their favor for $597,735.80. Defendant has appealed.

Henry Lenahan, Sr. was the founder, president and, at the time of his death, sole stockholder of Lenahan Associates, a New Jersey Corporation, which owned real estate and equipment in Pitman, New Jersey. Lenahan Associates processed resins and sold them to manufacturers for the production of vinyl phonograph records. In approximately 1964, Hank Lenahan, with his father's assistance, established Lenahan Plastics, a Tennessee corporation, whose facilities were located in Tennessee and which was engaged in substantially the same business as Lenahan Associates. Hank Lenahan owned ninety-eight percent of the outstanding shares of capital stock of Lenahan Plastics, his wife, Margaret, owned one percent, and his father owned the remaining one percent.

By a purchase agreement, promissory note and security agreement dated July 1, 1977, Henry Lenahan, Sr. sold all but one of the 100 outstanding shares of Lenahan Associates to Lenahan Plastics for $700,000. The purchase agreement provides that the purchase price for the stock is to be paid by Lenahan Plastics' "execution and delivery ... of a promissory note, payable to [Henry Lenahan, Sr.] in fifteen equal annual installments including interest at six (6%) percent per annum until paid in full." (The terms of the promissory note make it clear that the annual payments are to be fifteen equal payments of principal and, with each principal payment, interest on the unpaid balance.) Upon default in any payment, the holder of the note was entitled to declare the entire unpaid balance of the note payable immediately without prior notice.

To secure the purchase price, interest and costs of collection, Lenahan Plastics' security agreement granted Henry Lenahan, Sr. a security interest in the ninety-nine shares of stock which he was selling. When this agreement was executed, a secured creditor could perfect his security interest in capital stock only by taking possession of the stock certificates. *See N.J.S.A.* 12A:9–304 (security interest perfected by possession); *but see also N.J.S.A.* 12A:8–321, effective Jan. 16, 1990 (perfecting security interest in

securities). The purchase agreement provides that possession will not be delivered to the creditor. The agreement states:

3. DELIVERY OF STOCK. SELLER hereby delivers to the PURCHASER ninety-nine (99) shares of the issued and outstanding capital stock of the Corporation with the proper endorsements thereon which vests good and marketable title to the stock in the PURCHASER as is being sold as provided in this Agreement.

4. REPRESENTATIONS OF SELLER. .... The delivery of said shares of stock of the Corporation to the PURCHASER, pursuant to the provisions of this Agreement, shall be made upon the execution of this Agreement and the promissory note hereinabove referred to in paragraph 2(a) above. SELLER will transfer valid title thereto, free and clear of all liens, encumbrances and claims of every kind.

Mr. Lenahan, Sr. delivered his shares of stock to Lenahan Plastics pursuant to these provisions. Two and a half months later, he died. His wife had predeceased him. His entire estate was left to an *inter vivos* trust which he created concurrently with the execution of his will. The will provided for distribution of ten percent of the trust income and corpus to Hank Lenahan and twenty-two and a half percent to each of his other four children. Hank Lenahan and First Pennsylvania Bank, N.A., which was subsequently merged into CoreStates Bank, were appointed and qualified as the decedent's co-executors and co-trustees.[1]

The $700,000 indebtedness due from Lenahan Plastics represented approximately two-thirds of the value of the net estate. The annual installments on the note, which were due on June 30 of each year, were paid on time through June 30, 1979. The installment due June 30, 1980, was paid July 30, 1980. The installment due June 30, 1981, was paid on time. The interest component of the installment due June 30, 1982 was paid July 15, 1982 and the principal was paid July 28, 1982. The installment due June 30, 1983 was paid on time. The installment due June 30, 1984 was paid July 25, 1984. The installment due June 30, 1985 was not paid and the bank accelerated the note by a letter on or about August 27, 1985. A $5,000 partial payment was made in

---

[1] In this opinion, we have referred to the corporate co-executor and co-trustee as CoreStates even when dealing with the period prior to the merger.

November 1987. No payments of principal or interest were made thereafter. CoreStates filed suit in Tennessee against Lenahan Plastics on October 27, 1987 and obtained a judgment against it in August 1988. By then or shortly thereafter, Lenahan Plastics had been adjudicated a bankrupt and the assets of Lenahan Associates were acquired by a trade debtor which had obtained and perfected a mortgage on its real property and a security interest in its equipment and accounts receivable.

The trial judge found that CoreStates had breached its fiduciary duties in "three key respects." First, the court found, the bank failed to keep itself informed of the financial condition and viability of Lenahan Plastics and Lenahan Associates. Secondly, it should have obtained possession of the capital stock of Lenahan Associates following Mr. Lenahan, Sr.'s death, and it failed to do so. Thirdly, it failed to declare that the promissory note was in default in 1982 and to "seize the assets of Lenahan Plastics and Lenahan Associates before other creditors did so." The court ruled that these failures were a proximate cause of its inability to collect the unpaid balance of the note for the benefit of the beneficiaries of the estate; alternatively, it ruled that CoreStates, as a fiduciary, had the burden of proving, if it could, that the steps which it should have taken would have been unavailing and it failed to sustain that burden.

CoreStates asserts on appeal that the trial court erred in concluding that it should have acted to accelerate the promissory note prior to the 1985 default. It also argues that the court was mistaken in its determination that it could have obtained possession of Lenahan Associates' stock after Mr. Lenahan, Sr.'s death and in its conception of the bank's rights and remedies. In addition, the bank contends that it is entitled to the benefit of the exculpatory clause of the decedent's trust and that the court erred in denying it fees and commissions on the uncollected portion of the promissory note.

In order to evaluate the trial court's rulings and CoreStates' arguments against them, we need, first, to determine what steps

the bank could have taken to collect the unpaid balance due from Lenahan Plastics. Secondly, if it failed to take one or more of the steps which it could have taken, we need to ascertain whether any such failure was a breach of its obligations as executor or trustee. Thirdly, if the bank breached any of its fiduciary obligations, we need to decide whether any such breach was, or should be presumed to be, a proximate cause of the loss suffered by the estate.

Experienced bank executives and trust administrators testified before the trial court as expert witnesses for both sides. Although they were not lawyers and did not claim to be legal experts, they undertook to define the bank's legal rights and duties and the standard of care to which it should have conformed as a corporate executor and trustee. The trial court appears to have based its conclusions about those legal rights and duties primarily on their testimony. The expert testimony was helpful on the question of what practices the bank should have adopted in order to fulfill its fiduciary obligations. But we view the definition of the bank's rights and duties as a fiduciary primarily as a legal matter and we will therefore undertake to determine them *de novo*. *Manalapan Realty, L.P. v. Township Committee*, 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995) (trial court's interpretation of law and legal consequences are not entitled to any special deference). The relevant evidentiary facts are largely undisputed.

CoreStates possessed no greater rights or remedies than Mr. Lenahan, Sr. would have possessed if he had survived. *N.J.S.A.* 3B:10–30 (personal representative has same power over title to property of the estate as absolute owner); *N.J.S.A.* 3B:14–23 (enumerating powers of fiduciary appointed by will or trust). Because Mr. Lenahan, Sr. agreed that he would surrender, and he did surrender, his Lenahan Associates stock certificates to Lenahan Plastics, duly endorsed for transfer, his personal representatives were not entitled to a better deal. The bank could have requested that Hank Lenahan surrender the stock certificates, but it had no legal right to demand their possession before the debt

had been accelerated for nonpayment. *Slowinski v. Valley Nat'l Bank*, 264 *N.J.Super.* 172, 185–86, 624 *A.2d* 85 (App.Div.1993) (secured creditor may repossess collateral upon default: debtor's failure to make payments as provided in the security agreement).

Hank Lenahan's personal financial interests as principal stockholder of Lenahan Plastics and, derivatively, as principal stockholder of its subsidiary, Lenahan Associates, conflicted with his obligations to his brothers and sisters as the co-fiduciaries of their father's estate. But Mr. Lenahan, Sr. created the conflicts by the terms of his will and trust. The trust expressly sanctions the conflicts [2] and the will does so by implication since the conflicts resulted from its provisions. Consequently, the bank had no right to secure Hank Lenahan's removal as co-executor and co-trustee unless and until his conduct as a fiduciary became, or substantially threatened to become, inconsistent with his obligations to the estate. *In re Koretzky*, 8 *N.J.* 506, 86 *A.2d* 238 (1951); *Wolosoff v. CSI Liquidating Trust*, 205 *N.J.Super.* 349, 362, 500 *A.2d* 1076 (App.Div.1985). So long as Hank Lenahan remained a co-executor and co-trustee, the bank could act in the name of the trust or testamentary estate only with the express or implied consent of both fiduciaries or, if they disagreed, with prior court approval. *Cf. Donaldson v. Borough of Madison*, 88 *N.J.Super.* 574, 586, 213 *A.2d* 33 (Ch.Div.1965) (every trustee under duty to participate in trust administration, but action can be taken by majority of trustees); *Dickerson v. Robinson*, 6 *N.J.L.* 195 (Sup.Ct.1822)

---

[2] The trust states:

In conferring the powers herein given to my Trustees, I direct that the fact that they or their nominees may be officers, directors, or employees of any such corporations shall not, insofar as my estate is concerned, constitute an adverse or conflicting interest, and their acts as Executors and Trustees shall be considered as if they owned no stock and their nominees were not officers, directors or employees of said corporation. I further direct that my Executors and Trustees shall not be responsible to anyone or be subject to surcharge by reason of any act or thing done or refrained from being done with relation to such corporations or for any depreciation in value or loss through retention of the stock thereof, except for their fraudulent acts in connection therewith.

(authority of co-executors is joint); *see also* 7 *New Jersey Practice, Wills and Administration* § 1095 (Alfred C. Clapp & Dorothy G. Black) (rev.3d ed.1984). *Cf. N.J.S.A.* 3B:14–21 (grounds for removal of co-fiduciary include refusal to join with other fiduciary in administration of estate where refusal may hinder or prevent administration or settlement of estate).

Lenahan Plastics' promissory note states, "Upon the default in the payment hereof, the entire unpaid balance of this Note shall be due and payable at the election of the Holder hereof without notice." In other words, whenever a payment due on account of the note was late in whole or in part, the note-holder had the power to make the entire unpaid balance of interest and principal immediately due and payable. The quoted language means that notice of an overdue installment was not a prerequisite for acceleration of the debt. However, the holder's election to accelerate had to be communicated to the debtor. *Overholt v. Merchants & Planters Bank*, 637 *S.W.*2d 463, 467 (Tenn.Ct.App. 1982) (option to accelerate must be exercised in a "clear manner" evidencing an unmistakable purpose to accelerate the debt); *see also Lee v. Security Bank & Trust Co.*, 124 *Tenn.* 582, 139 *S.W.* 690 (1911) (same). Once Lenahan Plastics was notified of the note-holder's election, the debtor would no longer be entitled to restore its right to pay the balance in installments over the original term of the note by tendering the tardy installment. *Cf. Lively v. Drake*, 629 *S.W.*2d 900, 903 (Tenn.1982) (tender of overdue amount after acceleration does not negate acceleration absent agreement of the parties); *Lee, supra*, 124 *Tenn.* 582, 139 *S.W.* 690 (acceleration may not occur if overdue amount tendered prior to exercise of option to accelerate).

Because Hank Lenahan was the president of Lenahan Plastics and owned ninety-eight percent of its outstanding stock, we assume he would not have joined the bank in exercising the right to call the note because of a default in the payment of interest or principal. The bank would have had to apply to the Chancery Division to remove him as a co-fiduciary. Presumably, he would

have been removed on a showing by CoreStates that suit against Lenahan Plastics was reasonably necessary and prudent in order to preserve and collect the assets of the estate. *In re Mild,* 25 *N.J.* 467, 481, 136 *A.2d* 875 (1957) (executor has non-delegable duty to collect and preserve estate's assets); *In re Koretzky, supra,* 8 *N.J.* at 528, 86 *A.2d* 238 (where trustee's interest conflicts with interests of beneficiaries, grounds for removal stated). *See also N.J.S.A.* 3B:14–21 (refusal to join in administering estate is grounds for removal).

■ In a lawsuit against Lenahan Plastics, the bank would appropriately have sought both a money judgment and possession of the Lenahan Associates stock in order to sell it and apply the proceeds on account of the indebtedness. The record does not show whether Lenahan Plastics could have been sued in New Jersey or whether suit would have had to be brought in Tennessee. Since the bank has not proved otherwise, we will assume that personal service could have been made on Lenahan Plastics in New Jersey. The bank could have expected to be successful in its suit on the promissory note against Lenahan Plastics and, unless bankruptcy or state insolvency intervened, to obtain a judgment for the entire outstanding indebtedness with accrued interest. *Optopics Laboratories Corp. v. Sherman Laboratories, Inc.,* 261 *N.J.Super.* 536, 546, 619 *A.2d* 614 (App.Div.1993) (summary judgment on debt due and owing granted where execution of loan agreement and fact that monthly payments were to be made admitted, and demand for payment made). If Lenahan Associates was solvent, the bank could also appropriately have asked for and obtained an order or judgment for possession of the capital stock of that corporation in order to foreclose its security interest by selling the stock in any commercially reasonable manner. *N.J.S.A.* 12A:9–503 (on default, secured party has right to take possession of collateral); *N.J.S.A.* 12A:9–504 (after default, secured party may sell or otherwise dispose of collateral in any commercially reasonable manner). The bank would not have had the right to retain the stock without purchasing it at a sale; but,

of course, the bank might very well have been able to acquire the stock for a nominal bid. *See N.J.S.A.* 12A:9–504(3) (secured party may buy collateral at sale); *BJL Leasing Corp. v. Whittington Singer Davis and Co., Inc.,* 204 *N.J.Super.* 314, 321–22, 498 *A.*2d 1262 (App.Div.1985) (creditor cannot retain collateral without notice to debtor).

A New Jersey judgment against the corporation could have been docketed in Tennessee where its property was located and could have been satisfied out of any available assets, subject to the usual priorities and possible bankruptcy. *Tenn.Code Ann.* § 26–6–101 through –107. The proceeds from the sale of the Lenahan Associates stock would be applied on account of the debt. If the stock was sold to the fiduciaries of the Lenahan estate, their claim against Lenahan Associates would be to the equity of the corporation, that is, to what remained after payment of all of the other creditors of Lenahan Associates. *See N.J.S.A.* 14A:7–14.1 (corporation cannot make distribution to shareholders if it will render it unable to pay its debts); *Watkins v. Commonwealth Sav. & Loan Ass'n,* 71 *N.J.Eq.* 711, 712, 64 *A.* 751 (Ch.1906) (general creditors of corporation entitled to payment before stockholders receive distribution of assets).

Against the background of this summary of what legal steps CoreStates could have taken to collect the unpaid balance of Lenahan Plastics' debt, we will next consider whether its failure to act was a breach of its fiduciary obligations. That depends, of course, on what CoreStates knew or should have known about the operations and financial condition of Lenahan Plastics at each of the times when the bank had the legal right to declare a default, accelerate the debt, and commence a lawsuit to foreclose its security interest in the stock of Lenahan Associates and to obtain a judgment against Lenahan Plastics. *See N.J.S.A.* 3B:10–26 and 3B:20–13 (personal representative or fiduciary with special skills is under duty to exercise those skills for benefit of beneficiaries); *In re Mild, supra,* 25 *N.J.* 467, 136 *A.*2d 875 (executor must actively administer the estate); *Wild v. Brown,* 120 *N.J.Eq.* 31, 183 *A.* 899

(Ch.1936) (fiduciary must make inquiries necessary to form intelligent judgment on estate's assets). Our determination whether and when the bank should have acted also depends on what weight it could reasonably have given to countervailing considerations.

■ In deciding whether, when, and how to act, the bank was entitled to consider the financial condition of the estate and the needs of the beneficiaries. The estate was illiquid. At least one of the beneficiaries was in need of cash and looked forward to the distributions of principal which would be made after estate taxes were paid. The estate owed estate taxes. The bank had to enter into an agreement with the Internal Revenue Service to pay the taxes over a period of years with interest at twelve percent a year. The taxes were paid in full only in 1984 when the next largest asset of the estate after the Lenahan Plastics note, an interest in Phil–Mar Corporation, a restaurant, was sold for $300,000.

Some delay in the receipt of cash would have eventuated whenever the bank declared a default, accelerated the debt, and pursued its legal remedies. In view of the estate's need for cash, if the only other relevant facts were the relatively short delays which the estate experienced in its receipt of the payments due from Lenahan Plastics on June 30, 1980, 1982 and 1984, the bank's decision to waive these delays and to refrain from accelerating the debt would surely not have been a breach of its obligations.

■ The slight duration of the delays and the estate's need for cash were the only facts that CoreStates focused on. But both the plaintiffs' and the bank's witnesses testified, and the bank's own policy manual confirmed, that because the promissory note represented such a large proportion of the estate's assets, generally accepted standards of practice of corporate fiduciaries required the person responsible for administering the estate on behalf of the bank to become and remain knowledgeable about the operations and finances of Lenahan Plastics. Apart from a 1978 request for financial information for estate valuation purposes and a conversation with Hank Lenahan in 1981, the bank made no

effort whatsoever to obtain such information and knew almost nothing about the company's operations and finances.

█ If the bank had tried, it undoubtedly could have obtained the requisite information, either through the voluntary co-operation of its co-fiduciary, from sources of information regularly available to financial institutions, or through court intervention by virtue of the bank's ownership of the one share of Lenahan Plastics stock which had been retained by Mr. Lenahan, Sr. and the estate's status as a substantial debtor. *Tenn.Code Ann.* § 48-26-102 (shareholder has right to inspect and copy corporate records for legitimate business purpose). If diligent efforts by all reasonably available methods had proved unsuccessful, it would have been prudent for the bank to draw the most pessimistic inferences from the stonewalling and to have acted accordingly. In any event, since the bank made no efforts to inform itself and even disregarded potentially alarming information which came to its attention from the plaintiffs or other family members, the reasonableness of its conduct must be judged in the light of what it actually knew, what it would have learned from Lenahan Plastics' consolidated financial statements, which included the data for Lenahan Associates, and what it could have ascertained from reasonable inquiries and observations.

█ Lenahan Plastics and Lenahan Associates both used a fiscal year ending on June 30. Consequently, the most recent formal financial statements that could have been available to CoreStates between July 1 and July 31, 1980, which was the bank's first opportunity to declare a default and accelerate the note, would have been the June 30, 1979 financial statements. The consolidated balance sheet as of that date for Lenahan Plastics, which was audited, shows total assets of $5,517,956 and stockholders' equity of $2,214,586; current assets of $3,724,989 and current liabilities of $2,553,747. A consolidating balance sheet as of the same date shows stockholders' equity for Lenahan Associates—the "asset" which was subject to the bank's security interest—to be $2,166,957. "Earnings" of Lenahan Plastics on a

consolidated basis for the year ended June 30, 1979 were a loss of $559,170 [3]. This loss was certainly serious and warranted inquiry. However, 1979 appears to be the first year for which there are data in the record in which Lenahan Plastics sustained a loss. In the 1978 fiscal year, the company had reported consolidated earnings of $843,875.

In addition to the one-month delay in payment, plaintiffs point to the fact that the installment due June 30, 1980 was paid by a check from Lenahan Associates rather than by one from Lenahan Plastics. Their expert referred to this as "a horn blowing" which should have led the bank to inquire why Lenahan Plastics was not making the payment. No doubt the delay itself should have led to inquiries. But under all the circumstances, a corporate fiduciary familiar with the June 30, 1979 and earlier financial statements would not have breached its obligations to its beneficiaries if it did not seize on the one-month delay in payment of the June 1980 installment to declare a default and accelerate the due date of the note.

As previously mentioned, the payment due from Lenahan Plastics on June 30, 1982 was made in two installments, an interest payment on July 15, 1982, which was paid by a check of Lenahan Associates, and the principal payment on July 28, 1982. By that time the affairs of the Lenahan companies were clearly deteriorating and there were reports that Hank Lenahan was acting strangely. In January 1981, the CoreStates bank vice-president who was responsible for administration of the Lenahan estate met with Hank Lenahan and observed that he had driven to

---

[3] Plaintiffs' expert, Joseph McElroy, testified that the consolidated loss for 1979 was $887,000. He read that figure from a line graph, P–27 in evidence, that he had prepared from financial statements of Lenahan Plastics. The source of the data is not specified and is not apparent. A handwritten summary of financial data also prepared by Mr. McElroy, P–26 in evidence, shows the consolidated loss for 1979 as $559,000. Perhaps Mr. McElroy misspoke when he attempted to interpret his graph on the witness stand. The anomaly is not explained in either his direct or cross-examination.

the appointment in a custom-made bus equipped with a television set, a full bathroom, a queen-size bed, captains' chairs, couches, and a large refrigerator. The implication of the bank officer's testimony is that he thought Hank Lenahan's use of the vehicle was both strange and extravagant for the president of a corporation with annual sales of only $8,000,000.[4] Between 1980 and 1982, the volume of product produced at Lenahan Associates had been reduced by half. By 1981, the Lenahan corporations' principal supplier of raw material knew that the companies were in financial difficulties because they were not paying their bills on time.

The consolidated financial statements of Lenahan Plastics show that for the fiscal year ended June 30, 1978, the company had net earnings of $181,932 (excluding $661,943 of proceeds from insurance on Mr. Lenahan, Sr.'s life); and for the fiscal year ended June 30, 1979, a net loss of $559,170. The financial statement for 1980 contained in the record is not comparable with those for the two preceding years because it is unaudited and covers only the six-month period from July 1 to December 31, 1980. It shows net earnings of $105,855 (including $39,000 of extraordinary tax credit for the carry forward of the prior year's operating loss). Net earnings for the year ended June 30, 1981 were $54,967 (including $29,000 from a prior year's net operating loss carry forward). However, the financial statements of Lenahan Plastics show that between June 30, 1978 and June 30, 1981, stockholders' equity, most of which was attributed to retained earnings, fell from $2,773,756 to $1,382,071. Judging from the earnings statements, this means that a loss of $1,069,414 must have been incurred in the fiscal year ended June 30, 1980. The bank's expert witness on estate administration testified that the $1.4 million decline in retained earnings indicated a "fundamental problem."

An accountant's note to Lenahan Plastics' December 31, 1980 financial statements, which were issued February 5, 1981, states:

---

[4] Evidence in the record demonstrates that the bus was purchased prior to the death of Mr. Lenahan, Sr. for the use of Hank and James Lenahan.

> The accompanying financial statements have been prepared in conformity with generally accepted accounting principles, which contemplate continuation of the Company as a going concern. However, the Company has sustained substantial losses from operations in recent years.
>
> In view of the matters described in the preceding paragraph, realization of a major portion of the assets reflected in the accompanying balance sheet is dependent upon continued operations of the Company, which in turn is dependent upon the Company's ability to meet its financing requirements on a continuing basis, to maintain present financing, and the success of its future operations. Management believes that the steps it has taken in revising its operating and financial requirements provide the Company with such ability.

The June 30, 1982 and 1983 financial statements carried similar notes.

The threat to the Lenahan estate's ability to obtain payment of the balance of its note was aggravated by Lenahan Associates' contributions of capital to Lenahan Plastics. The estate's only collateral was its security interest in the capital stock of Lenahan Associates. The value of the capital stock was reduced by the subsidiary's transfers of capital to the parent corporation. The 1981 balance sheet of Lenahan Associates shows that as of June 30 of that year, it had advanced $1,391,932 to Lenahan Plastics, reducing stockholders' equity in Lenahan Associates to $1,126,091.

All of these facts should have been known to CoreStates when Lenahan Plastics failed to pay the June 30, 1982 installment on time. This information should have led the bank to declare a default, accelerate the due date of the outstanding indebtedness, and, if necessary, remove Hank Lenahan as a co-fiduciary and institute an action to obtain a judgment and to realize on its security. If, despite diligent efforts, the bank was unable to extract this information from its co-fiduciary or from the debtor, that itself should have been enough reason for the bank to pursue its legal remedies on behalf of the beneficiaries of the Lenahan estate. We agree with the trial judge that the bank's failure to act following the June 1982 default was a breach of its fiduciary obligations. *Cf. In re Koretzky, supra,* 8 *N.J.* at 524, 86 *A.*2d 238 (executors had duty to use reasonable care in estate administration and to prevent co-executors from committing breach of trust); *Blauvelt v. Citizens Trust Co.,* 3 *N.J.* 545, 554, 71 *A.*2d 184 (1950)

(trustee owes duty to beneficiaries to exercise "that degree of care, prudence, circumspection and foresight, that an ordinary prudent person" would exercise in managing his own affairs).

In July 1982, after the previous late payment, Gerald W. Yule, who was a business executive and the husband of one of the beneficiaries, reported to John Tracy, the bank's trust administrator, rumors in the family about Hank Lenahan's use of illegal drugs and about his having threatened one of his brothers with a gun. He also told Mr. Tracy that he had spoken to Alexander Farkas, the longtime manager of Lenahan Associates' facility in Pitman, New Jersey, and that Mr. Farkas was "rather upset about the direction the company was going in." During 1982, James Lenahan informed Mr. Tracy that he had seen his brother, Hank Lenahan, on a television news program as Hank was being arrested for a drug violation. James, who had worked for Lenahan Plastics at one time, also told Mr. Tracy that he had visited its facility and learned that money was tight and machines were being sold. Mr. Tracy testified that on various dates which he did not specify one or more members of the Lenahan family told him that Hank Lenahan had been arrested in Florida for drug smuggling.

In December 1982, the Lenahan companies' main supplier of raw materials had Hank Lenahan, his wife, Lenahan Plastics and Lenahan Associates guarantee Lenahan Plastics' accounts receivable. Thereafter, the amount of the company's trade debt to its supplier, which had been approximately $75,000 in 1977, $200,000 in 1980, and $300,000 in 1982, rose to $400,000.

In 1983, Lenahan Associates' plant manager died of brain cancer, its manufacturing operation was terminated, and its production facility was boarded up. That was the last year in which Lenahan Associates produced a product. During the same period, difficulties developed between Hank Lenahan and his wife which resulted in their divorce.

The Lenahan Plastics consolidated financial statements for the years ended June 30, 1982 and 1983 show that Lenahan Plastics

and Lenahan Associates had a net loss of $428,787 in 1982 and of $230,206 in 1983. By June 30, 1983, retained earnings had been wiped out and stockholders' equity as reported on the balance sheet reduced to $723,078. Financial statements of Lenahan Associates for the year ended June 30, 1983 have not been included in the record. The next financial statements of Lenahan Associates, which are those for the year ended June 30, 1985, show a negative equity, i.e., insolvency, of $89,603.41.

The payment due June 30, 1984 to the Lenahan estate was paid July 25, 1984. This payment was made by a check from the corporation's accountants. No explanation is provided in the record, but payment by a check of the accounting firm is suggestive of a "workout" under conditions of insolvency or extreme financial stringency. The bank's failure to reject that payment and to act to accelerate and collect the note was a patent violation of its obligations.

CoreStates argues that even if its failure to act was a breach of its obligations as a fiduciary, that breach was not a proximate cause of the plaintiffs' loss because the assets of Lenahan Plastics and Lenahan Associates would have been insufficient to pay the debt. However, the evidence which the bank cites in support of that contention, including two 1986 orders of Tennessee courts, all relate to dates long subsequent to July 1982 and July 1984. The bank has failed to demonstrate that diligent action on its part on or about those dates would have been futile. Because the bank, as a fiduciary seeking to escape the consequences of its breach, has the burden of proof on that issue, plaintiffs are entitled to the presumption that the action which the bank was obligated to take would have avoided the harm which plaintiffs have suffered. *In re Mild, supra*, 25 *N.J.* at 488, 136 *A.*2d 875; *Branch v. White*, 99 *N.J.Super.* 295, 313, 239 *A.*2d 665 (App.Div.), *certif. denied*, 51 *N.J.* 464, 242 *A.*2d 13 (1968).

We reject CoreStates' argument that it is insulated from liability by the exculpatory provision of the Lenahan trust. Plaintiffs contend that that provision is inapplicable because the bank

was acting as executor rather than trustee. We conclude that it is unnecessary for us to decide in which capacity the bank was functioning. The exculpatory clause was clearly inapplicable even if CoreStates was acting as trustee. The language of the clause shows that it was intended to protect the trustee against liability for actions taken in the operation of the business which the settlor owned when he executed the trust agreement. It was not intended to exculpate the trustees from liability for failure to collect the assets of the trust. *Blauvelt, supra*, 3 *N.J.* at 554, 71 *A.*2d 184 (exculpatory clause is subject to strict construction).

We also hold that the trial court's denial of fees and corpus commissions to CoreStates on the portion of the indebtedness which it did not collect is not an abuse of discretion. *In re Estate of Moore*, 50 *N.J.* 131, 149, 232 *A.*2d 641 (1967) (fixing of corpus commissions is matter of trial court's discretion and will not be set aside absent abuse); *cf. Bank of New Jersey v. Abbott*, 207 *N.J.Super.* 29, 38, 503 *A.*2d 893 (App.Div.1986) (fixing of trustee's commissions will not be overturned absent abuse of discretion).

By way of cross-appeal, plaintiffs argue that they should have been awarded compound, rather than simple, interest; that the court erred in awarding them only ninety, rather than one-hundred, percent of the uncollected principal of the promissory note; that the court should have disallowed the attorneys' fees which the bank spent in connection with a 1988 Tennessee action against Lenahan Plastics to collect the note; and that they should have been awarded attorneys' fees. We disagree and conclude that none of these arguments require any discussion, *R.* 2:11–3(e)(1)(E), except the contention that the judgment in favor of the estate should have been for one-hundred percent of the uncollected debt of Lenahan Plastics. As to that argument, we note only that the bank has obtained a default judgment against Hank Lenahan. He has a ten percent interest in the estate. Allowing the bank to retain ten percent of what the estate would otherwise

be entitled to recover is a fair equivalent of enforcing the bank's judgment against Hank Lenahan.

The judgment appealed from is therefore affirmed in all respects.